Subscribed and sworn to, before me, this _30th_ day of _June_, 1983.

_Maureen M. Cureba_
NOTARY PUBLIC
My Commission Expires: _9/15/86_

Herbert BADGLEY, et al., Plaintiffs-Appellees-Cross-Appellants,

v.

Thomas J. VARELAS, Sheriff, Nassau County, et al., Defendants-Appellants-Cross-Appellees,

J. Kevin McNiff, Chairman, New York State Commission of Correction, et al., Defendants-Appellants.

Nos. 680, 690 and 691, Dockets 83–2345, 83–2357 and 83–2359.

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1983.

Decided Feb. 24, 1984.

Robert J. Raubach, Nassau County Legal Aid Society, Mineola, N.Y. (Matthew Muraskin, Michael J. Obus, Martin I. Rosenbaum, Mineola, N.Y., on brief), for plaintiffs-appellees-cross-appellants.

Barbara B. Butler, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Richard Howard, Asst. Atty. Gen., New York City, on brief), for defendants-appellants McNiff and Coughlin.

James M. Catterson, Jr., Port Jefferson, N.Y. (William H. Pauley, III, Cynthia Webb, and Orenstein Snitow & Pauley, P.C., New York City, on brief), for defendants-appellants-cross-appellees Varelas and Flood.

Before TIMBERS, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal concerns one of the most troublesome issues in the administration of criminal justice—prison overcrowding. Unlike so many cases now confronting federal and state courts, this case does not require determination of the maximum number of prisoners that may lawfully be confined in a single jail or prison. That maximum number has already been agreed to by those who run the jail at issue in this litigation. The problem now is how to bring the number of inmates down to the maximum number that was incorporated in a consent judgment entered more than three years ago and exceeded ever since. There are only three possibilities: transfer prisoners to other institutions, release prisoners to the streets, or halt the admission of the new prisoners until the population is reduced by normal turnover. On this appeal from orders of the District Court for the Eastern District of New York (Jacob Mishler, Judge), we conclude, for reasons set forth below, that the third alternative is

the one that a federal district court should order with respect to the county jail at the center of this litigation. The other alternatives remain available for use by state and local officials.

## Background

This litigation was begun in 1980 when suit was filed by a group of inmates at the Nassau County Correctional Center ("NCCC"). The original defendants were Michael P. Seniuk, Sheriff of Nassau County, Walter J. Flood, Warden of the NCCC, and Stephen Chindlund, then Chairman of the New York State Commission of Correction. The plaintiff inmates, suing on behalf of a class of all present and future inmates of the NCCC, sought a declaration that conditions at the jail violated their constitutional rights and, somewhat paradoxically, an order barring defendants from moving them to other facilities beyond the New York City metropolitan area. More than half the inmates are pretrial detainees. At a hearing on October 29, 1980, before then District Judge George C. Pratt on a motion for a preliminary injunction, there was no dispute that the jail population at that time, 771, substantially exceeded the design capacity of 517. Judge Pratt denied the request to bar reassignment of inmates, consolidated the action with a previously filed suit challenging conditions at the NCCC, *Palma v. Treuchtlinger*, 72 C 1653 (E.D.N.Y.), and urged the parties to discuss proposals for settlement. In the absence of progress by the spring of 1981, Judge Pratt issued orders requiring defendants to reduce the population at the NCCC to 517 within sixty days and to admit no more than 14 inmates for every 15 released. Civ. 80–2916 (E.D.N.Y. Feb. 25, May 6, 1981). This Court stayed these orders and remanded the case to the District Court for reconsideration in light of *Lareau v. Manson*, 651 F.2d 96 (2d Cir.1981). Nos. 81–2181, –2182 (2d Cir. June 2, 1981).

Upon remand, the plaintiffs and the County defendants entered into settlement discussions and on July 31, 1981, concluded an agreement for entry of a consent judgment. The agreement was signed by Warden Flood and Carmine Tavalaro, who had succeeded Seniuk as Nassau County Sheriff. Defendant Chinlund had been succeeded as Chairman of the State Commission of Correction by defendant J. Kevin McNiff, the current Chairman. McNiff did not sign the July 13, 1981, agreement. The agreement was incorporated into a consent judgment entered October 7, 1981. The consent judgment provided for an increase in the maximum capacity of the NCCC to 939, to be accomplished by the construction of a new dormitory and the use of double-celling, which was subject to specified limitations concerning duration and conditions of confinement. However, in recognition of state law requirements prohibiting the intermingling of various categories of inmates, such as men and women, adults and minors, sentenced and unsentenced inmates, *see* N.Y.Correct.Law § 500–c (McKinney Supp.1983), the parties agreed that the maximum population of the NCCC would be less than the maximum number of cell spaces.[1] The judgment provided for a maximum population of 800, which was increased to 808 on March 24, 1983, with the certification of eight additional cells. In addition to this population ceiling and the detailed limitations on the use of double-celling, the consent judgment contained provisions on a variety of other topics, including medical services, food, recreation, telephones, contact visits, and staffing.

On August 26, 1982, Judge Pratt, responding to motions by the plaintiffs alleging noncompliance with the consent judgment, appointed Professor David K. Kadane of the Hofstra Law School as a Special Master to assist in enforcing the judgment. On December 10, 1982, the Special Master submitted his first report. He found several violations of the consent judgment, including inmate population

---

1. The parties apparently agreed that classification requirements permit use of no more than 85% of total cell spaces at any one time.

above the 800 limit on several days, numerous inmates housed in contravention of the double-celling limitations, continued use of prohibited cots,[2] and contact visits of shorter duration and frequency than the required three one-hour visits per week.

On February 9, 1983, the Special Master issued his second report, finding that conditions since his first report had "considerably worsened" and identifying several respects in which the consent judgment was being "flouted." The 800 population limit had been exceeded on 29 of the intervening 75 days, and by 50 or more inmates on eight days. One in seven inmates were double-celled at locations or for periods in violation of the consent judgment. Cots were still being used, and the excessive population was causing curtailment of various activities, including recreation and religious services. Inmates in protective custody were confined with other inmates. Looking toward a remedy, the Special Master took two steps. First, he prepared a series of provisions, some in alternative form, that might be appropriate for a court decree; however, he expressed the salutary thought that it would be preferable for the Court to insist that the County be forced to select appropriate remedies, rather than have the Court "choose among them, which would involve the Court more closely in the operations of the local agency than a federal court would wish." Second, he scheduled a hearing to afford the parties an opportunity to present evidence and suggest their own alternative solutions.

After five days of hearings, the Special Master issued his third report on July 13, 1983. He concluded: "There can be no doubt, on this record, that there is violation upon violation by the County defendants of the provisions of the [consent judgment]; and that these violations are all related to the increased overcrowding at the jail." The population limit, by then adjusted to 808, was exceeded on 52 of the 69 days examined, often by numbers in excess of

50. On one day the population was 875. The Special Master noted no attempt by the County defendants to excuse this violation of the judgment, nor any claim that the violation was inadvertent or temporary. He also noted that the overcrowding was causing numerous violations of other provisions of the consent judgment, including those concerning double-celling, cots, contacts visits, medical services, and recreation.

Turning to the matter of remedies to be recommended to the District Court, the Special Master displayed a sensitive recognition of the need to enforce the judgment of a federal court while minimizing intrusion into administrative details within the competence of local officials. His principal recommendation was that the County defendants be given ninety days to comply with all provisions of the consent judgment on pain of contempt and that, if the ninety-day period elapsed without compliance with the population limit, no prisoner be admitted to the NCCC on any day that the inmate population exceeded 808. Relying on testimony of New York State Commissioner of Correctional Services Thomas A. Coughlin, III, that substantial unused capacity existed at the nearby Long Island Correctional Facility ("LICF"), formerly Pilgrim State Hospital, in adjacent Suffolk County, the Special Master recommended that the Court order the transfer of some inmates from the NCCC to the LICF. He also recommended a phased removal of the second bunk from most of the double-bunk cells, as beds began to be available for use in the new dormitory, then nearing completion. His recommendation called for the eventual reduction of double-bunk cells to 56. He also recommended elimination within thirty days of all use of cots and mattresses on floors.

In anticipation of a District Court hearing on August 23, 1983, the Special Master furnished a fourth report on August 10 with current population figures. In the period from July 5 to August 7, the popula-

---

**2.** Cots were prohibited not as a matter of comfort, but for safety of property and, on occasion, of person. The cots were placed in corridors. Theft of bedding and personal property was common, and inmates sleeping in corridors were at risk of assault.

tion exceeded 808 on each day, and on 18 days it exceeded 900. In the Special Master's opinion, the situation "has now deteriorated further to an emergency status." The Master subsequently reported that the population reached a high of 1,032 on October 9, 1983.

Plaintiffs moved in the District Court for action upon the Special Master's third report, and on September 13, 1983, Judge Mishler issued an initial order based on the Special Master's findings. The order directed "defendants," who then were NCCC Warden Flood, Nassau County Sheriff Thomas J. Varelas (who had succeeded Tavalaro), and New York Correction Commission Chairman McNiff, to take the following steps: (1) within sixty days, transfer NCCC inmates in excess of 808 to either the LICF, or to a residential treatment facility, if the inmate was eligible under New York Correct. Law § 73 (McKinney Supp.1983), or to the State Division for Youth, if the inmate was eligible under New York Correct. Law § 75 (McKinney Supp.1983); (2) thereafter, if the population exceeded 808 for more than 72 hours, transfer any inmate who is a deportable alien eligible for parole to the Immigration and Naturalization Service ("INS"),[3] or meet the limit of 808 by the transfer options of paragraph (1); and (3) prohibit the admission to the NCCC of any Intermittent Sentence Inmates (those serving weekend sentences) when the NCCC population exceeded 808.

Judge Mishler noted that Commissioner Coughlin, the State Commissioner of Correctional Services, was not a party to the litigation and expressed the view that the terms of the order could not be carried out without Coughlin's cooperation. Relying on the provisions of Rules 65(d) of the Federal Rules of Civil Procedure, which make an injunction binding upon "those persons in active concert or participation with [defendants] who receive actual notice of" an injunction order, Judge Mishler, directed plaintiffs to serve a copy of the injunction upon Commissioner Coughlin. The injunction included a specific direction to Commissioner Coughlin to lease to Nassau County any institution under his jurisdiction in order to accommodate Intermittent Sentence Inmates. *See* New York Correct. Law § 79 (McKinney Supp.1983).

Both the plaintiffs and the County defendants moved for modification of the September 13 order. After a two-day hearing Judge Mishler issued three orders on October 5, 1983. First, he amended the September 13 order to delete the alternative provisions for transfer of eligible inmates to residential treatment facilities and the State Division for Youth, since such inmates are not confined at the NCCC. The provision of the September 13 order providing for transfer to the LICF was amended to add the phrase "or other suitable place." Second, he issued an order concerning transfer of NCCC inmates to state custody. This order directed (1) that within 72 hours the County Sheriff transfer to the State of New York all NCCC inmates who are serving terms exceeding one year and have been at the NCCC for more than ten days, and that the Commission of Correction and the Commissioner of Correctional Services shall receive such inmates; (2) that the Sheriff transfer to state custody all state sentenced inmates within ten days of their entry into the NCCC; and (3) that "the Commission of Correction and/or the Commissioner of Correctional Services shall exercise the authority granted under the New York Correction Law and perform their duties imposed under said law by accepting all inmates of the [NCCC] in excess of 808 within the time periods set forth in the order of September 13, 1983." Finally, Judge Mishler granted a motion by the County defendants to join Commissioner Coughlin as a party-defend-

---

**3.** Though not a party to this litigation, the United States has informed us by letter of its objection both to the merits of the provision concerning the INS and the propriety of including it in the District Court's order in the absence of notice to the Government. In view of our disposition vacating the order of September 13 on other grounds, the Government's objections require no determination.

ant and for leave to file a cross-claim against him.[4]

The plaintiffs, the County defendants, and the State defendants all appeal from the September 13 and October 5 orders, all of which were stayed by this Court pending disposition of the appeal.[5] The plaintiffs contend that the orders are ineffective and seek modification to render them effective. The County defendants challenge the District Court's determination that the conditions at the NCCC violated the plaintiffs' constitutional rights and also seek modification of the terms of the consent judgment. The State defendants seek reversal of all of the provisions of the September 13 and October 5 orders that require action on the part of Commissioner Coughlin and Chairman McNiff.

Discussion

1. *The County Defendants' Appeal.*

A. The first issue raised by the County defendants concerns the nature of the determination made by the District Court. In the District Court's view, the Special Master had made a "finding" of a "constitutional violation" of the rights of the pretrial detainees protected by the Due Process Clause of the Fourteenth Amendment, *see Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and the rights of the sentenced inmates protected by the Cruel and Unusual Punishments Clause of the Eighth Amendment, *see Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The District Court ruled that this "finding" was supported by the record and therefore "adopted" it.

■ The County defendants urge, and the plaintiffs agree, that the Special Master did not make a finding of a constitutional violation. The misunderstanding on this point perhaps derives from a passage in the Special Master's third report in which he stated that the consent judgment had "resolved" the question whether conditions at the NCCC met the standards of the Eighth

and Fourteenth Amendments. He stated, "In effect, the parties have agreed that conditions falling below the levels prescribed in the Consent Judgment fail to meet those constitutional standards, while conditions which attain those levels will not be objected to on those constitutional grounds." This is simply not so. Like most consent judgments, the agreement between the plaintiffs and the County defendants contains no admission of liability. In agreeing to specific terms for the operation of the NCCC, the County defendants did not concede that any conditions at the jail falling short of the agreed terms were constitutional violations. The judgment "resolved" the constitutional issues only in the sense that most consent judgments resolve disputes: It obviated any need to determine whether the claims of constitutional violation were established by substituting for an adjudication of those claims a contractual agreement between the signatories enforceable as a judgment of the District Court upon the Court's approval of the agreement and entry of a judgment. *See United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). All of the findings made by the Special Master concern the numerous respects in which the conditions at the NCCC were not in compliance with the terms of the consent judgment. To the extent that the District Judge affirmed these findings as constitutional violations, he was in error because no issue of constitutional violation was before him to determine. Whether or not the conditions at the NCCC violate the Constitution, they were found by the Master to violate the consent judgment, and that finding was the only one before the District Court for approval.

■ Having made the clarification in the preceding paragraph, we see no need to return the matter to the District Court to reconsider the Master's proposed findings as violations of the consent judgment, rather than the Constitution. The Master made

---

4. We do not understand the State defendants to have appealed from the order granting the County defendant's motion.

5. Technically, the orders were stayed only to the extent that they imposed obligations upon the State defendants; however, that stay effectively blocked all implementation of the core provisions of the orders.

detailed findings of the violations of the consent judgment, and it was obviously Judge Mishler's intention to adopt those findings. They are fully supported by the record. The County defendants do not dispute them. What remains at issue, to be considered, *infra,* on the appeals of the plaintiffs and the State defendants, is the appropriate remedy for the violation of the consent judgment.[6]

B. The County defendants also contend that the provisions of the consent judgment specifying limits on the duration and conditions of double-celling should be modified because of what they claim was a "mutual mistake" concerning these provisions. The provisions primarily challenged are those setting durational limits on double-celling of fifteen days for pretrial detainees and thirty days for sentenced inmates. The County defendants claim that these limits were determined in light of what was understood to be the average stay of inmates at the NCCC and appear to claim that currently available data show that the assumed estimates were incorrect. It is not clear whether the County defendants are questioning the estimates of average stay at the NCCC or average time of confinement in double-celling. The plaintiffs dispute that either side made any mistake in agreeing to the double-celling provisions.

■ In our view it is premature to consider on this appeal any claim for modification of the consent judgment. We see nothing in the rulings of the District Court that adjudicates any issues concerning modification of the consent judgment, nor does it appear that the District Court was properly requested to do so. The Special Master notes in his third report that the County defendants, in their brief to the Master, urged modification of the double-celling provision of the consent judgment.

The Master's report explicitly advises the County defendants that their request for modification should be made to the District Court. The Master then adds that, since the District Court had directed the Master to make recommendations from time to time, he will make a recommendation that the request for modification be denied. Under these circumstances, we think the preferable course is to await a specific motion by the County defendants to the District Court seeking modification of the consent judgment. It will then be the responsibility of the District Court to rule on such a motion, if one is filed, drawing upon the views of the Special Master to the extent the Court deems warranted and bearing in mind the pertinent standards concerning modification of consent judgments. *See New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983).[7]

### 2. *The State Defendants' Appeal.*

■ Chairman McNiff and Commissioner Coughlin appeal from all provisions of the September 13 and October 5 orders that require them to take any action with respect to inmates at the NCCC. Their appeal, opposed by both the plaintiffs and the County defendants, invites us to consider a host of perplexing issues, including the nature of their obligations under state law, the pertinence of the All Writs Act, 28 U.S.C. § 1651 (1976), and the extent to which either McNiff or Coughlin may be a person "in active concert of participation with" the County defendants within the meaning of Fed.R.Civ.P. 65(d). For several reasons, we conclude that it is inadvisable to consider any of these issues.

We note at the outset that the remedial orders challenged in this litigation were

---

**6.** Since we agree with the County defendants that there is no issue in this case concerning their compliance with constitutional standards, we need not consider their arguments that the record is insufficient to support a finding of constitutional violations.

**7.** The possibility that a motion to amend the consent judgment might be filed and granted provides no basis for delaying the remedial or-

der that we direct the District Court to enter in Part 3 of this opinion, *infra.* Amendment of the double-celling provision of the consent judgment would not lessen the need to secure prompt compliance with the population limit. Even if circumstances should arise warranting modification of the population limit, that limit should be enforced unless and until a modification is ordered.

issued to implement a 1981 consent judgment entered upon the agreement only of the plaintiffs and the County defendants. McNiff, though a party to the lawsuit, did not sign the agreement, and Coughlin was not even a party until ordered to become one by virtue of the granting of a motion by the County defendants on October 5, 1983. Neither of the State defendants has agreed to any provisions respecting inmates at the NCCC, nor has there been any adjudication that either has violated the constitutional rights of any of these inmates. If the plaintiffs have constitutional claims against the State defendants, they remain free to pursue such claims.

Next we observe that after the District Court issued its orders in this case, the Supreme Court rendered a significant opinion circumscribing the authority of a District Court to enjoin state officials from acting in violation of state law. *Pennhurst State School and Hospital v. Halderman,* — U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*Pennhurst II*). Whether *Pennhurst II* leaves any room for a District Court decree directed against state officials whose actions may be necessary to implement, or at least to avoid the frustration of, a judgment that does not rest on a determination of a constitutional violation is an issue that need not be resolved at this time.[8]

Finally, we conclude that the need for any relief against the State defendants does not arise at this time in view of the availability of a remedy that may be directed solely to the parties who signed the consent judgment and that will secure for the plaintiffs compliance with the provisions of that judgment. That remedy is discussed below in connection with the plaintiffs' appeal. Suffice it to note at this point that the availability of such a remedy, in light of the non-acquiescence of the State defendants in the consent judgment and the advent of *Pennhurst II,* makes it inappropriate to order any relief against the State defendants at this time.

---

**8.** We do not foreclose the possibility that at some point the plaintiffs may wish to seek an adjudication of whether the acts or omissions of the State defendants have caused or contributed

### 3. *The Plaintiffs' Appeal.*

■ The plaintiffs contend in essence that the District Court's orders are insufficient to secure compliance with the consent judgment and are inadvisedly directed primarily to State officials, rather than to the County officials who bear the primary responsibility for carrying out the agreement they made with the plaintiffs. We think the plaintiffs' points are well taken. We do not doubt the difficulty of the task the District Judge faced in endeavoring to fashion a remedy that would enforce the consent judgment within the framework of fragmentated responsibility that unfortunately exists under New York law concerning the housing of pretrial detainees and sentenced prisoners. However, just as the terms of the consent judgment specify the obligations to be carried out, the signatories of that judgment determine who bears the primary responsibility for compliance. The County defendants undertook to avoid the risks of litigation and a potentially more burdensome judgment by agreeing to the terms of the consent judgment.

Though we agree with the plaintiffs that the remedial orders, under present circumstances, should be directed more pointedly to the County defendants, we do not accept the specific modifications they suggest. The plaintiffs urge an order for the immediate release of some inmates, the removal of all cots, a prohibition on requiring any prisoners to sleep on a mattress on a floor, and removal of upper bunks from all but 56 cells. They also request a general provision requiring the County defendants to comply with all provisions of the consent judgment by a day certain on pain of contempt.

Though release orders have been entered to alleviate prison overcrowding, *e.g., Duran v. Elrod,* 713 F.2d 292 (7th Cir.1983); *Benjamin v. Malcolm,* 75 Civ. 3073 (S.D. N.Y. Nov. 4, 1983), it must be obvious to all concerned that federal courts should hesi-

---

to a violation of the constitutional rights of the plaintiffs to a degree sufficient to provide a basis for relief against the State defendants.

tate before ordering state or local officials to release persons duly convicted of crimes or lawfully held in pretrial detention for lack of bail. Such an order is not warranted in this case. The NCCC has a high turnover of population. Some pretrial detainees secure release on bail, and many sentenced prisoners serve very short terms. In 1982 68% of all inmates in detention status were released within twenty days. Of those serving sentences, 56% served forty days or less. For a jail with such a high turnover of population, a prohibition on intake will rapidly secure compliance with a population limit. A ban on intake will also serve the salutary purpose of forcing all of the various state and local agencies who either have a need to place people in confinement or the responsibility for providing detention facilities, or both, to face up to the challenge of making alternative arrangements. Whether state and local officials prefer to make spaces available at the NCCC by transfer, release on bail, or outright release, or some combination of all three, is primarily their choice.

It is much easier to point a finger at the federal court and explain to a mystified public that the federal court has ordered prisoners released than it is to take action to find places for them. If the NCCC were closed today because of a natural disaster such as fire or disease, we have little doubt that the responsible officials of New York State and Nassau County would figure out some way to confine tomorrow those arrested by the police and sentenced by the courts. The persistent violation of the population limit of the consent judgment—a violation now entering a fourth year—is an equivalent disaster.[9]

We recognize that the state and local agencies who normally expect to send prisoners to the NCCC are entitled to some brief period of time to make temporary alternative arrangements while cooperating on more long-range solutions. We will therefore direct the District Court to enter an order enjoining the County defendants, as of thirty days from the date of our decision today, from accepting any person for confinement at the NCCC until the inmate population has been reduced to 808 and further providing that, thereafter, they may not accept any person for confinement at the NCCC if that person will increase the inmate population above 808.[10]

Since we are directing the District Court to deal forcefully with enforcement of the population limit, we see no need at this time to require the Court to impose specific remedies concerning other provisions of the consent judgment. With the normal turnover in inmate population, a ban on intake can be expected to bring the population down to 808 in a short time. Once that occurs, the County defendants should have little difficulty ending other violations of

---

**9.** State law provides:

1. *If* there is no jail in a county, or *the jail becomes unfit* or unsafe for the confinement of some or all of the inmates, civil or criminal, or is destroyed by fire or otherwise, or if a pestilential disease breaks out in the jail ... *the state commission of correction,* upon application, *must ... designate another suitable place within the county or the jail of any other county,* for the confinement of some or all of the inmates, as the case requires....

2. *Where the jail in a county becomes unfit* or unsafe for the confinement of some or all of the inmates *due to* an inmate disturbance or a natural disaster including but not limited to flood, earthquake, hurricane, landslide or fire, or *other extraordinary circumstances* upon the request of the [appropriate county official] and no other suitable place within the county nor the jail of any other county is immediately available to house some or all of the inmates, *the commissioner of correctional services is* hereby *authorized* and empowered

*to make available,* upon such terms and conditions as he may deem appropriate, *all or any part of a state correctional institution* for the confinement of some or all of such inmates as an adjunct to the county jail for a period not to exceed thirty days. However, if the county jail remains unfit or unsafe for the confinement of some or all of such inmates beyond thirty days, the state commission of correction, with the consent of the commissioner of correctional services, may extend the availability of a state correctional institution for one or more thirty day periods.
New York Correct. Law §§ 504(1), (2) (McKinney Supp.1983) (emphasis added).

**10.** The provision for gradual progress toward the population limit, contemplated by Judge Pratt's 1981 ruling that no more than 14 inmates be admitted for every 15 released by expiration of sentence, transfer, or otherwise, was an admirable procedure for preliminary injunctive relief prior to any final determination of the

the consent judgment, all of which stem from the present overcrowding. However, we do not mean to foreclose the District Court from determining in its discretion the appropriateness, now or in the future, of additional remedies reasonably required to secure compliance with the judgment, including the establishment of a deadline for complete compliance on pain of contempt.

## Conclusion

With respect to all of the appeals and cross-appeals, we rule as follows:

1. The order of the District Court entered September 13, 1983, as modified on October 5, 1983, is vacated.

2. The order of the District Court entered October 5, 1983, ordering transfer of inmates of the NCCC and other relief is vacated, except for the amendment of the case caption to substitute J. Kevin McNiff for Stephen Chinlund.

3. The request of the County defendants for modification of the consent judgment is denied, without prejudice to a motion in the District Court seeking such relief.

4. The findings of the District Court are affirmed to the extent that they determine violations of the consent judgment and vacated to the extent that they determine violations of the Constitution.

5. The cause is remanded to the District Court

(a) with directions to enter forthwith an order

(1) enjoining the County defendants, thirty days after the date of this Court's decision, from accepting any persons, whether sentenced, awaiting trial, or in any other status, as inmates at the Nassau County Correctional Center, until such time as the inmate population of the Center is no more than 808, and, after such limit has been reached, from accepting any persons as inmates at the Center if the admission of such persons will increase

the inmate population of the Center above 808; and

(2) requiring the County defendants to give prompt notice to all courts, police departments, and other federal, state, and local governmental agencies that send persons for confinement at the Center of the terms and effective date of the order and the consequent unavailability of the Center, and to renew such notice in the event of any subsequent unavailability of the Center; and

(b) for such additional proceedings, including entry of additional remedial orders, as the District Court may deem warranted to secure enforcement of the consent judgment.

Vacated and remanded. No costs. The mandate shall issue forthwith.

plaintiffs' claims. Now that the County defendants have agreed to avoid litigation by accepting a specified population limit and three years have passed without compliance with the consent judgment incorporating their agreement, the time for prompt and effective action has arrived.