James BENJAMIN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, Commissioner
of Corrections of the City of New
York, et al., Defendants.

v.

Mario CUOMO, et al.,
Third-Party Defendants.

Ernesto MALDONADO, et al.,
Plaintiffs,

v.

Benjamin J. MALCOLM, Commissioner
of Corrections of the City of New
York, et al., Defendants.

DETAINEES OF the BROOKLYN
HOUSE OF DETENTION FOR
MEN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, Commissioner
of Corrections of the City of New
York, et al., Defendants.

DETAINEES OF the QUEENS HOUSE
OF DETENTION FOR MEN, et
al., Plaintiffs,

v.

Benjamin J. MALCOLM, Commissioner
of Corrections of the City of New
York, et al., Defendants.

Iola FORTS, et al., Plaintiffs,

v.

Benjamin J. MALCOLM, Commissioner
of Corrections of the City of New
York, et al., Defendants.

Nos. 75 Civ. 3073 (MEL), 76 Civ. 2854
(MEL), 79 Civ. 4913 (MEL), 79 Civ.
4914 (MEL) and 76 Civ. 101 (MEL).

United States District Court,
S.D. New York.

March 17, 1986.

See also, D.C., 626 F.Supp. 1264.

The Legal Aid Soc., New York City, for plaintiffs; Theodore H. Katz, Jonathan Chasan, Dale Wilker, of counsel.

Frederick A.O. Schwarz, Jr., Corp. Counsel, New York City, for defendants; Leonard Koerner, Asst. Corp. Counsel, of counsel.

Robert Abrams, Atty. Gen. of State of N.Y., New York City, for third-party defendants; Barbara B. Butler, Asst. Atty. Gen., of counsel.

LASKER, District Judge.

The history of this much litigated case involving the overcrowding of New York City jails is set forth in numerous prior decisions, *see Benjamin v. Malcolm,* 564 F.Supp. 668 (S.D.N.Y.1983); *Benjamin v. Malcolm,* 528 F.Supp. 925 (S.D.N.Y.1981); *Benjamin v. Malcolm,* 495 F.Supp. 1357 (S.D.N.Y.1980); *Benjamin v. Malcolm,* 88 F.R.D. 333 (S.D.N.Y.1980). On January 30, 1986, in the most recent decision in this action, we granted the motion of Governor Mario Cuomo and Thomas A. Coughlin III, Commissioner of the New York State Department of Correctional Services ("the State defendants") to vacate this court's

August 20, 1981 order requiring the State defendants to accept "state ready"[1] inmates within forty-eight hours. In moving to vacate the order the State defendants asserted, and we concluded, that under *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*"Pennhurst II"*) the Court lacked subject matter jurisdiction to order the relief against the State defendants because, as we found, the August 20, 1981 order clearly had been based upon state law.[2] *See Benjamin v. Malcolm,* 626 F.Supp. 1264, 1270 (S.D.N.Y.1986). However, because we also concluded that there might exist grounds for relief against the State defendants that would not be barred by the Eleventh Amendment we stayed the effect of the January 1986 decision for thirty days to permit the Commissioner of Corrections of the City of New York and the various other City officials who are defendants (collectively "the City" or "the City defendants") to assert such grounds if the facts permitted. *Id.* at 1270.

On February 24, 1986 the City moved by order to show cause to join the State defendants pursuant to Federal Rules of Civil Procedure 19, 20 and 21. The order to show cause, signed by the court on that day, included a temporary restraining order requiring the State Commissioner "to accept custody of each person housed in correctional facilities of the City of New York who is sentenced to a term of imprisonment in a State facility within forty-eight hours after the necessary papers for transfer have been completed." Alternatively, the City moved for a preliminary injunction for the same relief in the event that its motion was not disposed of before the temporary

---

**1.** The State defendants assert:
"A State ready inmate is one who has been sentenced to a state institution, whose court commitment papers have been completed, whose fingerprints have been recorded, whose fingerprint cards have been filled out, whose presentence report has been completed, whose medical history, psychiatric reports, disciplinary record, history of assaults, riots, etc., has been collected and put together in a packet and whose local facility is capable of

delivering the inmate to a state reception center."
Affidavit of Thomas A. Coughlin at ¶ 10 (Mar. 5, 1986).

**2.** By order of April 25, 1984 a prior order requiring the State defendants to house out-to-court inmates also was vacated under *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*"Pennhurst II"*).

restraining order became ineffective. The State Commissioner cross-moved to vacate the mandatory temporary restraining order because it "extends beyond the ten days allowed for in F.R.C.P. 65(b)...." [3]

## I. JURISDICTION

The State defendants argue that the court does not have jurisdiction even to consider the motion to join them because, it is claimed; (1) the Federal Rules of Civil Procedure do not provide a jurisdictional basis; (2) the City cannot assert a claim against the State defendants based upon the plaintiffs' constitutional rights; and (3) the obligations of the State defendants, if any, arise solely from state law.

Citing *Tate v. Frey*, 735 F.2d 986 (6th Cir.1984), the City defendants maintain that the "State officials' presence in the litigation is necessary because their absolute control over the State readies ... has a direct impact on the City's ability to manage its facilities ... to comply with ... this Court's prior orders," and that such relief is not barred by the Eleventh Amendment.

Simply stated, the jurisdictional issue is whether *Pennhurst II* prohibits federal courts from ordering relief against state officials whose actions may be necessary to implement, or at least to avoid the frustration of, a judgment that rests on a determination of a constitutional violation. Without, for the moment, reaching the question whether such relief is justified, we conclude for the reasons set forth below that *Pennhurst II* does not prohibit granting relief in such cases.

The important, but simple, rule of *Pennhurst II* is that a federal court may not order a state official to conform his conduct to state law. "A federal court," the *Pennhurst II* majority stated, "must exam-

ine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment." *Pennhurst II*, 104 S.Ct. at 919.

The State defendants apparently interpret this language as requiring examination of each "cause of action" which is asserted. They maintain that since the only cause of action which the City may bring against the state officials is one based upon state law, the conclusion follows, according to the State's argument, that *Pennhurst II* bars the City from requesting any relief against them. However, the rationale is inapplicable because, unlike the facts in *Pennhurst II*, which concerned the liability stage of that litigation, the plaintiff-inmates in this action already have obtained a judgment securing their constitutional rights. Accordingly, the "claim" to be examined, in this case in its present posture, is the City's assertion that the State defendants must be joined in order to assure full compliance with the existing decree which assures the plaintiffs' protection of their constitutional rights. Moreover, in the case at hand the City is the party which would suffer contempt penalties for noncompliance with court orders limiting inmate population in the event those limits were exceeded. Thus, the City has standing to request relief from being held accountable for actions by the State defendants over which it has no control but which allegedly cause or contribute to violations of the Court's orders.

Nor is the fact that the State defendants' responsibilities in the first instance are created by state law sufficient to defeat jurisdiction. Numerous situations are recognized by our federal legal structure in which obligations under state law may give rise to a federal claim. *See, e.g., Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct.

---

**3.** Fed.R.Civ.P. 65(b) states in relevant part:

Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted

without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period.

2701, 2709, 33 L.Ed.2d 548 (1972) (property interests cognizable under the Constitution "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....").[4]

Furthermore, the United States Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act [28 U.S.C. § 1651(a)] as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained...." *United States v. New York Telephone Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977).

> The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, ... and encompasses even those who have not taken any affirmative action to hinder justice [citations omitted].

*Id.* at 174, 98 S.Ct. at 373.[5]

Jurisdiction in this case was "obtained" in the first instance, as the result of plaintiffs' claims under 42 U.S.C. § 1983 *et seq.* Further, although no "basis of jurisdiction may override the Eleventh Amendment," *Pennhurst II*, 104 S.Ct. at 919, in this case reliance on the All Writs Act as a basis for further jurisdiction does not conflict with the Eleventh Amendment since the order at issue does not rest upon state law grounds. Of course, invoking the extraordinary basis for jurisdiction provided by the All Writs Act should not be a casual undertaking. *Cf. General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 401, 102 S.Ct. 3141, 3155, 73 L.Ed.2d 835 (1982) ("There was no need for the District Court

to treat petitioners as strangers to this lawsuit, and therefore to rely upon some extraordinary form of process or writ to bring them before the court.") However, if it is concluded that the presence of state officials is necessary for the full satisfaction of constitutional rights, joining them in the litigation is, in our view, not only consistent with the purpose of the All Writs Act, but also with the reasoning underlying the exception to the Eleventh Amendment which was created in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), namely, "to promote the vindication of federal rights" and "hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst II*, 104 S.Ct. at 910.

Finally, we observe that in a case such as this, in which the defendant alleges that the third party's actions prevent the defendants from fulfilling the plaintiffs' constitutional rights, a conclusion that *Pennhurst II* barred joining state officials for the purpose of assuring a remedy for a constitutional wrong would result in the anamolous situation in which the state courts could fully address a federal constitutional deprivation but the federal courts could not.

## II. INJUNCTION

The prerequisites to the grant of a preliminary injunction are that (a) there is a showing of irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly toward the party requesting the preliminary relief. *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125 (2d Cir.1984) (per curiam); *Jackson Dairy*,

---

**4.** Indeed, when taken to its logical extreme, the State defendants' argument that their obligations arise only under state law would preclude even plaintiffs from asserting a constitutional claim against the State defendants based upon their alleged contribution to the overcrowding. *Pennhurst II* compels no such result.

**5.** The City defendants do not raise the All Writs Act, 28 U.S.C. § 1651(a), as a basis for jurisdiction but the plaintiffs have made this argument in their letter brief submitted in response to the State defendants' motion to vacate the August 20, 1981 order.

*Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

 We conclude that those requirements have been met by the City defendants.

### A. Irreparable Harm

As the Court of Appeals for the Second Circuit has recently stated, "[t]he linchpin of such interim relief is that threatened irreparable harm will be prevented by [an] injunction." *Buckingham Corporation v. Karp,* 762 F.2d 257, 262 (2d Cir.1985).

The City defendants assert that by June 1985 the number of state ready inmates began to climb and that as of March 7, 1986, the date of the hearing on its motion, there were more than 500 state readies housed by the City. According to the City "as of [that date] the number of State readies presently housed by the City in violation of this Court's forty-eight hour order would fill the new White Street jail." Affidavit of Leonard Koerner at ¶ 4 (Mar. 7, 1986). The City further maintains that in the absence of the relief it seeks it would not be able to estimate the number of state readies it could be required to house hereafter and therefore cannot adequately plan for its short and long term needs; that it has to devote approximately fifty percent of its newly added space (which has nearly doubled the City's capacity since 1979) to house state inmates and that a significant percentage of the state inmates are state readies; that the presence of large numbers of state inmates affects the City's ability to maintain its physical facilities and to plan for future construction; and that the presence of the state inmates creates serious operational problems for the City correctional facilities, affecting such areas as security, visiting, recreation, medical care, food, appropriate housing and educational programs. Affidavit of Jacqueline McMickens at ¶¶ 5, 16–22 (Feb. 20, 1986).

The State defendants vigorously challenge the City's method of computing the daily numbers of state readies housed in City facilities. According to the State defendants' calculations, for example, there were only approximately 250 state ready inmates in the City jails on March 7th. Moreover they argue that the fluctuation of the City's inmate population is caused by certain, predictable seasonal factors, such as the fact that the number of inmates paroled increases during the November-January holiday season.

The City has accounted for the seasonal rise and fall of the inmate population. Furthermore, the fact that the number of state readies in the City jails may fluctuate to a greater or lesser degree depending on the season does not eliminate the significance of the state readies' presence. In any event, despite the argument as to the correct calculation of population, it is undisputed that the numbers of state readies in the City system has averaged in the hundreds.

The claim that such varying numbers wreak havoc with a municipality's ability to manage its facilities and interfere with the on-going planning and building process in which the City is currently engaged is persuasive, and monetary damages cannot adequately compensate the City (nor the plaintiff class) for the continuing injury. In short, the City has met its burden of showing irreparable harm.

In this connection it is worthy of note that the City only seeks continuation of the status quo: that is, the continuance of an order that has been in effect in this case for almost five years. It is true that the City defendants' submissions on the motion make reference to various other categories of state inmates housed in City facilities which allegedly are contributing to its dilemmas.[6] However, the reply affidavit of Leonard Koerner states, "The City's request merely continues the Court's ruling of July 29, 1981 requiring the State to accept State readies within forty-eight hours after their processing has been completed." Affidavit of Leonard Koerner at

---

6. The dispute between the City and the State concerning the City's housing parole violators is part of a suit currently being litigated in the Supreme Court of the State of New York.

¶ 4 (Mar. 4, 1986). We accept this statement as accurately characterizing the relief requested at this time. In such a factual context the City is not required to meet the more stringent showing of irreparable harm that might be required to justify changing the status quo. *See Doe v. New York University,* 666 F.2d 761, 773 (2d Cir.1981).[7]

## B. The Seriousness of the Questions Presented

*Badgley v. Varelas,* 729 F.2d 894 (2d Cir.1984), decided shortly after the determination in *Pennhurst II,* involved a consent judgment that was entered by agreement between inmates at the Nassau County Correctional Center ("the NCCC") and various Nassau County Officials ("the County defendants"). After a Special Master found that the County defendants had continually violated the consent decree, the plaintiffs moved for, and the Court granted, injunctive relief which involved the use of State facilities.

Because the District Judge was of the opinion that the terms of the order could not be carried out without the cooperation of the State Commissioner (who was not then a party to the litigation) the Court directed plaintiffs "to serve a copy of the injunction [which included a specific direction to the Commissioner to lease to Nassau County any institution under his jurisdiction to accommodate a certain class of inmates] upon [the State] Commissioner." *Badgley v. Varelas,* 729 F.2d at 898. The District Court later granted a motion by the County defendants to join the State Commissioner as a party-defendant and for leave to file a cross-claim against him. All of the parties appealed.

The Court of Appeals held (1) that neither the Special Master's findings nor the District Court's order was an adjudication of a constitutional violation; (2) that a ban

on intake was the appropriate relief and that such relief could "also serve the salutary purpose of forcing all of the various state and local agencies who either have a need to place people in confinement or the responsibility for providing detention facilities, or both, to face up to the challenge of making alternative arrangements," *id.* at 902; and (3) that in view of the availability of such a remedy, "in light of the non-acquiescence of the State defendants in the consent judgment and the advent of *Pennhurst II,*" it was inappropriate to order relief against the State defendants at that time." *Id.* at 901. However, the *Badgley* court specified that its decision left open the question "[w]hether *Pennhurst II* leaves any room for a District Court decree directed against state officials whose actions may be necessary to implement, or at least to avoid the frustration of, *a judgment that does not rest on a determination of a constitutional* violation...." *Id.* (emphasis supplied).

The State defendants argue that *Badgley* bars the granting of relief in this case. However, as we read *Badgley,* it is distinguishable from the case at hand.

First, *Badgley*'s unanswered question is not precisely the issue in this litigation because here, unlike *Badgley,* the population cap *was* set as a result of the court's determination of a constitutional violation. *See Benjamin v. Malcolm,* 495 F.Supp. at 1365. Since the judgment here *does* rest on a constitutional violation we believe that, by implication *Badgley* holds that *Pennhurst II* does not bar federal jurisdiction and, in any event, the case at hand is more compelling than the hypothetical case left open in *Badgley.*

Second, the facts here are substantially different from those of *Badgley.* For example, it appears that in *Badgley* the State was merely a passive party which owned

---

7. The City moves to join the State defendants in five actions: *Benjamin v. Malcolm,* No. 75–3073, *Maldonado v. Malcolm,* No. 76–2854, *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* No. 79–4913, *Detainees for the Queens House of Detention for Men v. Malcolm,* No. 79–4914 and *Forts v. Malcolm,* No. 76–101.

However, the forty-eight hour order in the past has only been in effect in *Benjamin v. Malcolm* and will not be extended beyond its previous scope at this time. If the City seeks relief in the several other cases a further submission should be made that clearly indicates the relief sought since the current papers do not do so.

facilities which Nassau County wished to use whereas here the City alleges that the State defendants are actively preventing the City from meeting its obligations. Further, to the extent that *Badgley* may be read to suggest that the court stay its hand if cooperation between the governments involved will solve the problem, a philosophy which we share, *see Benjamin v. Malcolm,* 88 F.R.D. at 336 (denying without prejudice the City's motion to join the State defendants because it appeared the State and the City would be able to resolve their differences without the court's intervention), the historical facts of this litigation establish that court orders have been necessary because of a lack of cooperation. *See Benjamin v. Malcolm,* Transcript at 129 (July 29, 1981) (granting the City's motion to join the State defendants); *see also Benjamin v. Malcolm,* 528 F.Supp. 925 (S.D.N.Y.1981) (denying the State defendants' motion to be relieved temporarily from the order requiring the State to accept state ready inmates within forty-eight hours); Stipulation of the parties entered into Sept. 7, 1984 (acknowledging parties' agreement to expand the time within which the State was required to accept state-readies from forty-eight to ninety-six hours).

In sum, *Badgley,* as we read it, does not foreclose the relief sought by the City defendants. At the least it is clear that the issues raised as to the proper construction of *Pennhurst II* and *Badgley* raise sufficiently serious questions going to the merits to make them a fair ground of litigation.

### C. Hardship

As set forth in the affidavit of the State Commissioner the State's current procedure for taking state readies from City facilities into its own system is based upon the number of beds that the State officials predict will be available for the following week. In the past, due to the court order requiring the State to accept state readies within forty-eight hours the State has given priority to inmates housed in New York City facilities over those housed in other jails throughout the State. However, the State defendants assert that the state sys-tem is currently overcrowded, that the State is under pressure from other localities to collect State inmates from their facilities, and accordingly, that it would be an undue and unfair burden to require the State to continue giving priority treatment to the City.

The City stresses that the present levels and fluctuations of state inmates is interfering with the City's ability to manage its facilities. Although the City defendants do not assert that the current number of detainees violates the existing decree, it does maintain that the situation created by the presence of the state inmates places the City eyeball to eyeball with violating the existing decree as to population limits and that the City should not be required to wait until a violation of the decree actually exists before it is granted protective relief.

As indicated above, this Court has been confronted on various occasions with the necessity of weighing the relative hardships facing the State and the City, in determining whether to grant relief requested by one of the parties. We recognize the difficulties facing both. What was stated in 1981 remains true today:

> No one who has dealt with the chronic difficulty of prison or jail overcrowding can fail to be sensitive to its human implications, and to the pain which it imposes on inmates, and correctional personnel, alike. Moreover, it is important to remember that the State inmates and correctional personnel are just as human, and suffer just as much when impermissible overcrowding occurs, as do City inmates and personnel.

*Benjamin v. Malcolm,* 528 F.Supp. at 929.

Balancing the equities between the two governments has not been made simpler by the passing of time. Nevertheless, upon scrupulous evaluation of the facts we conclude that the balance of hardship does tip decidedly toward the City.

Several of the conclusions that we have previously reached remain valid today. They include:

1. As to public safety: ... overcrowding is a serious threat to the securi-

ty of both State and City institutions. However, State institutions are remote from population centers and its maximum security institutions are walled and protectable. City institutions are massed together in the center of population of New York City and without such physical features as walls.

2. As to the relative impact of the court's decision on the respective systems: it remains an inescapable fact that the State Correctional system is nearly three times as large as the City's and that the relative impact on the State of additions to its population of 200–300 people will therefore be proportionately less. Moreover, the impact can be diffused among many other institutions than would be true in the City system. . . .

3. As to the difference between conditions in detention centers in general and prisons in general: it remains true that a prison population is generally more stable and manageable than the population of a jail.

*Id.* at 929–30.

Finally, while an injunction continuing the requirement that the State accept state inmates within forty-eight hours will continue the State's burden, it does not, in the present posture of the case, increase it, while denying the injunction would leave the City vulnerable to the possibility, if not probability, of a very significant increase in its inmate population.

### III. JOINDER

 Joining the State defendants as parties is appropriate under Rule 19 "if (1) in [their] absence complete relief cannot be accorded among those already parties." Fed.R.Civ.P. 19. If, as the City asserts, the number of state readies is determined to be over 500, "the presence of State prisoners in such large numbers [would] constitute an insurmountable roadblock to the fulfillment of the City's obligations." *Benjamin v. Malcolm*, 88 F.R.D. at 334. The City's motion therefore is appropriately brought. It is true that determination of whether the State defendants will be retained permanently as defendants in the action must await the disposition of the dispute as to whether the State's actions or proposed actions do or would hereafter place the City in a position of noncompliance with the court's decrees. At the present time, however, the State defendants' presence in the litigation is required, at a minimum, to dispose finally of the fact questions raised by the City defendants' motion. Further, since (1) we have concluded that *Pennhurst II* is not a bar to jurisdiction over the subject matter of the action, (2) joining the State defendants is "feasible", and (3) the Governor and State Commissioner are subject to service of process, all of the prerequisites for joinder under Rule 19 are met.

The City's motion for a preliminary injunction is granted.[8]

Submit decree on notice.

8. Disposition of the State defendants' motion not to join Governor Cuomo because he is not the State official responsible for directing the relief sought is deferred because the City has not briefed the issued.