803 F.2d 46
 James BENJAMIN, Miguel Galindez, Bruce Hayes, Jose Saldana
and Robert Eschert, detainees of the New York City House of
Detention for Men, individually and on behalf of all other
persons similarly situated, Plaintiffs-Appellees,
v.
Benjamin J. MALCOLM, Commissioner of Corrections of the City
of New York; Arthur Rubin, Warden, New York City House of
Detention for Men; Gerard Brown, Deputy Warden, New York
City House of Detention for Men; and Edward I. Koch, Mayor
of the City of New York, individually and in their official
capacities, Defendants-Appellees,
Mario Cuomo, Governor of the State of New York, and Thomas
A. Coughlin III, Commissioner, New York State
Department of Correctional Services,
Third-Party Defendants-Appellants.
 No. 15, Docket 86-2165.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 3, 1986.
Decided Sept. 25, 1986.
 
 Barbara B. Butler, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., State of N.Y., Christopher Hall, Tarquin Jay Bromley, Asst. Attys. Gen., O. Peter Sherwood, Sol. Gen., Howard L. Zwickel, Chief Litigation Bureau, New York City, of counsel), for third-party defendants-appellants.
 Dale A. Wilker, The Legal Aid Society, Prisoners' Rights Project, New York City (Philip L. Weinstein, Theodore H. Katz, Jonathan S. Chasan, The Legal Aid Society, Prisoners' Rights Project, New York City, of counsel), for plaintiffs-appellees.
 Paul T. Rephen, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel, City of New York, Leonard Koerner, of counsel), for defendants-appellees.
 Before MANSFIELD, PIERCE and PRATT, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 Governor Mario M. Cuomo and Thomas A. Coughlin III, Commissioner of the New York State Department of Correctional Services (DOCS), who are third-party defendants in this civil rights action by pre-trial detainees under 42 U.S.C. Sec. 1983 claiming that overcrowded prison conditions in the House of Detention for Men (HDM) operated by the City of New York on Rikers Island[1] violate their constitutional rights, appeal from an order of the Southern District of New York, Morris E. Lasker, J., joining them as defendants and directing them promptly to accept custody of each adult male inmate housed in such a City facility, who has been sentenced to a term of imprisonment in a State prison. The court ordered them to accept custody of each prisoner within 48 hours after papers for transfer of the prisoner to a State facility had been completed. The principal contention of the third-party defendants-appellants is that, in view of the Supreme Court's decision in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Pennhurst II), holding that the Eleventh Amendment is a jurisdictional bar to a federal court order directing state officials to comply with state law, the district court lacked jurisdiction to issue the preliminary injunction and therefore abused its discretion. We affirm.
 
 
 2
 The history of this lawsuit is long and tortuous, extending over a period of more than 11 years. It has placed extraordinary demands upon Judge Lasker, who has explored the complicated facts with thoroughness and demonstrated unusual skill and patience in evaluating the constitutionality of the substandard conditions of detention found to exist in the City's facilities and in developing with the parties practical methods of alleviating them. Judge Lasker's analyses of the evidence and legal issues are found in a series of published decisions, familiarity with which is assumed. Benjamin v. Malcolm, 495 F.Supp. 1357 (1980); 88 F.R.D. 333 (1980); 528 F.Supp. 925 (1981); 564 F.Supp. 668 (1983); 626 F.Supp. 1264 (1986); 629 F.Supp. 713 (1986). The complaint, which was filed in June 1975, alleges that in violation of 42 U.S.C. Sec. 1983 various officials of the City of New York (hereinafter sometimes referred to as the "City") are responsible for a broad range of conditions at the HDM, which violate the detainees' constitutional rights, including those under the Eighth and Fourteenth Amendments, and seeks appropriate injunctive relief. By various orders entered during the period from July 1975 to July 1977 Judge Lasker enjoined the original defendants from continuing certain conditions found to violate the plaintiffs' constitutional rights, which dealt with contact visits, optional lock-ins, correspondence, discipline, receipt of books, and freedom from forced double-celling in cells built for one prisoner. After a plenary trial during 1976 and 1977, the parties in November 1978 reached a settlement with respect to complained of detention conditions at Rikers Island, Brooklyn, the Bronx and Queens, including uncleanliness, excessive cell confinement, inadequate food service and insufficient access to legal materials. In the spring of 1979 Judge Lasker accordingly approved and entered a Partial Final Judgment By Consent.
 
 
 3
 In September 1979 the then parties entered into a further stipulation designed to assure that the plaintiffs would be housed under constitutional conditions, which provided that the trial record had established that "[t]he housing blocks at HDM and the institution at large were overpopulated; such overpopulation resulted in an atmosphere of tension and hostility, a strain on all of the institution's facilities, and interference with supervision, protection and provision of services to members of the plaintiff class", Benjamin v. Malcolm, 495 F.Supp. 1357, 1359 (S.D.N.Y.1980). Pursuant to the stipulation, which was approved, judgment was entered to the effect that the conditions at HDM were unconstitutional, with the parties being afforded the opportunity to litigate what would be the appropriate remedy. In an opinion dated August 27, 1980, supra, 495 F.Supp. at 1364-65, Judge Lasker found, upon plaintiffs' motion to reduce the number of inmates at HDM, that "the record establishes that confinement of inmates at HDM has been conducted in such a manner over an extended period as to cause them to endure genuine privation and hardship; it is stipulated that such confinement was unconstitutional in September 1979, and we have found that the condition of unconstitutionality has not been removed." He further noted that various public and quasi-public bodies, after a long history of studies of HDM, had all concluded that "HDM [had] been dangerously overcrowded for years and [had] recommended that its population be stringently reduced." Id. at 1360. He thereupon ordered that the detainee population at HDM be reduced to 1200.[2] Id. at 1365.
 
 
 4
 Simultaneously the plaintiffs moved to join the Governor of New York and the Commissioner of DOCS (hereinafter sometimes referred to as the "State") as necessary third-party defendants on the ground that their refusal promptly to take off the City's hands so-called "state-ready" inmates at HDM (i.e., those who had been convicted of felonies in violation of New York State law and sentenced to more than one year in the custody of the State Department of Correctional Services) prevented the City from complying with Judge Lasker's "population cap" order. On November 19, 1980, the motion was denied without prejudice to renewal if the problem could not be resolved by cooperation on the part of the State. Benjamin v. Malcolm, 88 F.R.D. 333, 336.
 
 
 5
 In June 1981 the City renewed its motion to join the Governor and Commissioner of DOCS as third-party defendants because of the continued overcrowding of HDM attributed to the State's failure "forthwith" to accept "state-readies" from it as required by N.Y. Criminal Procedure Law Sec. 430.20 (McKinney 1983).[3] On August 20, 1981, Judge Lasker issued an order granting the motion and directing the State to accept "state-readies" within 48 hours after their transfer processing had been completed, as required by Sec. 430.20. On December 20, 1981, he denied the State's request for modification of his order, finding that the State's failure promptly to take these prisoners off the City's hands strained the latter's facilities beyond constitutionally tolerable limits so that the State was in effect simply seeking to spread the burden of impermissible overcrowding rather than eliminating it. Benjamin v. Malcolm, 528 F.Supp. 925, 930. In granting the City's motion and denying the State's cross-motion, Judge Lasker, although accepting the original parties' stipulation that the conditions at HDM were unconstitutional, decided that adequate relief could be granted on the basis of N.Y.Crim.P.Law Sec. 430.20 (McKinney 1983) and, accordingly, in reliance on established jurisprudential principles, concluded that it was unnecessary to base his decision on constitutional grounds. 528 F.Supp. at 929. Pennhurst II was not to be decided by the Supreme Court for another three years. Later, in May 1983, after a hearing and visit to the facility, the district judge independently made detailed findings to the effect that the overcrowded conditions of detention at HDM were unconstitutional and denied the City's motion to be relieved from certain portions of the court's earlier decree, ruling that compliance by the City defendants with the orders was essential to the restoration of constitutional conditions. 564 F.Supp. 668. Thus the district court's 1983 finding of unconstitutionality of the conditions at HDM was made long after the State had been ordered to cooperate in alleviating these conditions by promptly accepting state-ready prisoners. Yet the State took no steps to contest that finding.
 
 
 6
 Following the district court's August 20, 1981, order containing the 48-hour requirement, the State complied with the order until the summer of 1984 when the City, because it was engaged in a large construction program expected to increase its own correctional capacity, agreed with the State to relax the 48-hour period to 96 hours on the understanding that the State would on January 1, 1985, return to the 48-hour requirement. However, in 1985 the State did not adhere to that requirement and in February 1985 it moved to vacate the August 20, 1981, order on the basis of the Supreme Court's recent decision in Pennhurst II holding that the Eleventh Amendment deprived a federal court of jurisdiction to order State officials to comply with state law. In a decision dated January 30, 1986, published at 626 F.Supp. 1264, Judge Lasker granted the motion on the ground that, although the State's conduct may have violated federal law, his "earlier decision explicitly relied on state law only", i.e., N.Y.Crim.P. Sec. 430.20 (McKinney 1983). However, he deferred for 30 days a vacatur of his August 1981 order to enable the plaintiffs to decide whether to seek relief on federal constitutional grounds or from the State courts.
 
 
 7
 In February 1986, after the State continued to disregard the terms of the August 1981 order, the City again moved to join the Governor of New York and the Commissioner of DOCS pursuant to Fed.R.Civ.P. 19, 20 and 21 and for a preliminary injunction ordering them to accept state-ready prisoners from the City within 48 hours after their transfer papers had been completed. This relief was sought on the ground that the City could not remedy the unconstitutional conditions of confinement at its correctional facilities, which were attributed largely to the State's unwillingness to accept custody of its state-ready prisoners from the facilities, unless the State was ordered to do so by the court. In detailed affidavits, City officials outlined the limitations on the City's detention capacity, despite construction of additional holding space, and furnished statistics indicating that over the previous years the number of state-ready prisoners in the City's facilities increased sharply whenever the State was not under a court order to accept state-ready prisoners promptly.[4]
 
 
 8
 In an opinion dated March 17, 1986, Judge Lasker granted the City's motion to join the Governor and Commissioner as third-party defendants and for preliminary relief, ordering them to accept custody of each state-ready prisoner housed in City correctional facilities within 48 hours after the papers for transfer have been completed. Benjamin v. Malcolm, 629 F.Supp. 713. Judge Lasker found that the presence of the State officials as parties in the case was essential to assure protection of the plaintiffs' adjudicated constitutional rights. He concluded that Pennhurst II does not prohibit federal courts from issuing relief against state officials when necessary to prevent frustration of a judgment resting on constitutional grounds, as distinguished from state law, and that the All Writs Act, 28 U.S.C. Sec. 1651(a) empowered him to grant such relief as was necessary.
 
 DISCUSSION
 
 9
 The State's principal contention is that under the Supreme Court's decision in Pennhurst II the City's third-party claim against State officials must be dismissed as barred by the Eleventh Amendment because the court lacks jurisdiction to order them to comply with state law, i.e., to accept prisoners "forthwith", as the State is required to do by N.Y.Crim.P.Law Sec. 430.20. This contention, however, ignores the district court's finding that the refusal of State officials promptly to accept state-ready prisoners also violates a federal interest in vindicating the already-adjudicated constitutional rights of prisoners housed at the City's HDM. It has long been settled that the Eleventh Amendment does not prohibit a federal court from granting injunctive relief against a state official acting contrary to the United States Constitution. Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This was explicitly recognized by the Court in Pennhurst II, 465 U.S. at 105-06, 109 n. 17, 104 S.Ct. at 910-11, 912 n. 17, where the Third Circuit was held to have erred in basing its decision solely on the state officials' noncompliance with a state law, the Pennsylvania Mental Health and Mental Retardation Act of 1966, Pa.Stat.Ann., Title 50, Secs. 4101-4704 (Purdon 1969 and Supp. 1983-84), and the federal constitutional issues were not reached. The Supreme Court, in remanding the case a second time for further proceedings, noted,
 
 
 10
 "The District Court also rested its decision on the Eighth and Fourteenth Amendments and Sec. 504 of the Rehabilitation Act of 1973. See supra, at 93. On remand the Court of Appeals may consider to what extent, if any, the judgment may be sustained on these bases." 465 U.S. at 125, 104 S.Ct. at 921 (footnote omitted) (emphasis supplied).
 
 
 11
 In an effort to avoid the impact of the foregoing, the State argues that it has no responsibilities, constitutional or otherwise, with respect to state-ready prisoners other than those imposed on it by New York law. This argument must be rejected, however, for the reason that the prisoners whom it refuses promptly to accept into its prisons are not those of some other state, country or planet, but its own prisoners who have been convicted by New York State courts of New York State felonies. The State cannot therefore wash its hands of its federal constitutional responsibility for the detention conditions of such prisoners because they are temporarily housed in City facilities or because a New York statute requires the State to accept them "forthwith". Nor can the State avoid its federal constitutional responsibilities with respect to such prisoners on the grounds that to require it promptly to accept state-ready prisoners from the City will create problems for the State, because of the limited space in its State prisons, in handling the prompt transfer to it by other local communities in New York of state-ready prisoners temporarily held by them.[5] The numerous burdens faced by the State in meeting its constitutional obligations with respect to the housing of its prisoners does not provide it with a legal basis for avoiding those obligations.
 
 
 12
 Thus, if the plaintiffs in the present action had joined the State officials as defendants, alleging as an independent basis of jurisdiction that the State officials had contributed to the constitutionally impermissible conditions at the City's HDM, the Eleventh Amendment would not bar the issuance of injunctive relief against them even though their conduct would also violate state law. See, e.g., Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (administrators of state mental institution sued under 42 U.S.C. Sec. 1983 are obligated by Eighth Amendment to provide inmates with reasonably safe conditions of confinement, freedom from unreasonable body restraints and minimally adequate training); Society for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239 (2d Cir.1984) (where district court's order with respect to confinement conditions had been based on state law, case remanded in light of Pennhurst II to determine how much of order could be supported on constitutional grounds). As the Sixth Circuit stated in Spruytte v. Walters, 753 F.2d 498, 514 (6th Cir.1985):
 
 
 13
 "Although Spruytte's claim requires us to consider issues of state law, it does not follow that his claim is barred by Pennhurst. Spruytte's complaint alleges a violation of his federal constitutional rights. We decline to endorse the proposition that officials may undermine federal court authority by violating state as well as federal law." (emphasis in original).
 
 
 14
 The State's reliance on Badgley v. Varelas, 729 F.2d 894 (2d Cir.1984) (Badgley I ), is misplaced. In that case, upon a challenge by inmates of the Nassau County Correction Center to conditions of confinement in that prison the district court, setting a prison population cap at the facility, ordered the New York State Commissioner of Correctional Service to receive certain categories of sentenced inmates and to accept all in excess of the prison population cap. However, unlike the situation in the present case, there was no finding or adjudication that the prison conditions violated the prisoner's constitutional rights.[6] Indeed, we expressly left open the question of whether relief might be granted against the State in the absence of such an adjudication. Moreover, we concluded that the presence of State defendants was not necessary for complete relief.
 
 
 15
 Thus the case is clearly distinguishable from the present suit where there has been an adjudication of unconstitutionality and the State officials have been joined as third-party defendants allegedly contributing to and implementing that violation of the Constitution. Badgley I, therefore, does not govern the present case. More recently, in Badgley II, 800 F.2d 33 (2d Cir.1986), we noted that the Nassau County Correctional Center officials might well be able to comply with the court's earlier population cap order by applying to the State for an alternative place of confinement for prisoners in excess of the population cap, pursuant to N.Y. Correction Law Sec. 504(1) (McKinney Supp.1986).
 
 
 16
 The State contends, however, that even assuming that if the plaintiffs had joined its officials as parties the court would have had jurisdiction to enjoin them from violating the plaintiffs' constitutional rights, no such jurisdiction could be invoked by the City against them as third-party defendants. We disagree. F.R.Civ.P. 19(a)[7] permits the joinder of third parties whose absence would prevent the court from granting such relief as is necessary to adjudicate the rights of existing parties. Although this Rule does not confer jurisdiction upon the court over the City's third-party claim against the State, the court may exercise its residual jurisdictional authority under the All Writs Act, 28 U.S.C. Sec. 1651(a), to enter an order against the State. The All Writs Act authorizes a federal court in exceptional circumstances to issue such orders to persons "who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." United States v. New York Telephone Co., 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977) (citations omitted). The circumstances here are exceptional. The district court was faced with the necessity of acting immediately to relieve already-adjudicated unconstitutional conditions which might be attributed in part to the State and of avoiding the delay that would be entailed in the relitigation of those conditions. Pennsylvania Bureau of Correction v. United States Marshals Service, --- U.S. ----, 106 S.Ct. 355, 361, 88 L.Ed.2d 189 (1985), relied upon by the State, is therefore distinguishable and would not in any event deprive the court of any jurisdiction it might possess under more specific statutory grants of authority, e.g., 28 U.S.C. Secs. 1331, 1343. Nor is this a case where that Act is being used to by-pass or supersede the constitutional limitations of the Eleventh Amendment, see In re Baldwin-United Corporation, 770 F.2d 328, 340 (2d Cir.1985), since that amendment does not preclude relief based on federal constitutional grounds, Ex parte Young, supra.
 
 
 17
 In the present case, after extensive litigation the district court has found that the State's refusal promptly to accept state-ready prisoners in the City detention facility may contribute to the unconstitutional overcrowding and makes it impossible for the City to comply with the district court's judgment against it in the plaintiffs' favor. Full relief against these unconstitutional conditions cannot, therefore, be obtained through an order against the City alone but requires, because of the State's refusal promptly to accept state-ready prisoners, joinder as third-party defendants of appropriate State officials. When such a "less extreme" remedy is available the court is not obligated to resort to more draconian measures against the City alone, such as enjoining it from arresting or prosecuting distributors of the narcotic "crack", or ordering it to release detainees earlier than at present or on more liberal bail terms, or to refuse to accept detainees when to do so would exceed a population cap. See Ruiz v. Estelle, 679 F.2d 1115, 1145 (5th Cir.) (In context of prison administration, courts should "fashion 'the least intrusive remedy that will still be effective.' " (footnote omitted)), amended in part, vacated in part on other grounds, 688 F.2d 266 (5th Cir.1982), cert. denied, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); Resident Advisory Board v. Rizzo, 564 F.2d 126, 149 (3d Cir.1977) ("federal equitable relief must be carefully tailored to be no more intrusive than is necessary"); Gates v. Collier, 407 F.Supp. 1117, 1121 (N.D.Miss.1975) ("[N]o court is bound to invoke draconian measures [when] ... less drastic [measures] ... seem[ ] more likely to produce satisfactory results."). Faced with a situation parallel to that before us in the present case, the Sixth Circuit in Tate v. Frey, 735 F.2d 986 (6th Cir.1984), held Pennhurst II inapplicable since the overcrowded prison conditions in county detention facilities had been found to be unconstitutional, not merely a violation of state law (Kentucky Rev.Stats. Sec. 532.100). Accordingly, the court permitted the joinder of Kentucky State officials as third-party defendants upon the application of defendant county prison officials sued by prisoners, because the refusal of the former to accept state prisoners in a timely fashion contributed to the unconstitutional conditions of confinement in the county facilities and joinder of the state officials was essential for an effective remedy. The present case confronts us with a similar scenario.
 
 
 18
 The State next argues that the order against it, if based on federal constitutional grounds, denies it fundamental fairness since the State has not had a full opportunity to litigate the issue of whether the prison conditions allegedly contributed to by it have been unconstitutional. The State officials, however, have been third-party defendants in the action since 1981 pursuant to Judge Lasker's August 1981 order except for a short period after his January 1986 order of dismissal. During that long period it does not appear that the State was ever denied the opportunity to challenge the federal constitutional basis of the underlying consent order or the findings of unconstitutionality made by Judge Lasker in 1983. More important, the State does not presently offer any proof tending to dispute the existence of the conditions relied upon by Judge Lasker as the basis of his findings of unconstitutionality. Lastly, since the injunctive relief issued by the district court is preliminary, nothing prevents the State from offering rebuttal proof upon trial of the case for final relief. Indeed there is little doubt that, upon a trial relative to appellees' application for a permanent injunction, the State will be afforded the opportunity to address whether its activities actually contributed to the adjudicated unconstitutional conditions and to offer evidence that such unconstitutional conditions do not exist.
 
 
 19
 The State's next contention, that even if its officials could be joined as parties on grounds of contributing to unconstitutional conduct the City lacks standing to press the claim against them, needs little discussion. As a party facing direct injury from the State's alleged conduct, the City meets standing requirements. See Craig v. Boren, 429 U.S. 190, 194, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976); Singleton v. Wulff, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976); Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). It faces contempt sanctions for noncompliance with the district court's order. It would be forced to expend millions for additional detentional space if the State refused promptly to receive state-ready prisoners, and in the meantime it would lead to the threat of another major riot at HDM due to overcrowded conditions. These conditions suffice to confer standing on it. Board of Education v. Allen, 392 U.S. 236, 241 n. 5, 88 S.Ct. 1923, 1925 n. 5, 20 L.Ed.2d 1060 (1968); Regents of University of Minnesota v. National Collegiate Athletics Ass'n, 560 F.2d 352, 363-64 (8th Cir.1977); Akron Board of Education v. State Board of Education of Ohio, 490 F.2d 1285, 1289 (6th Cir.), cert. denied, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974).
 
 
 20
 In conclusion, the record supports the existence of conditions meeting well-established standards for issuance of preliminary relief, see Texaco Inc. v. Pennzoil Co., 784 F.2d 1133, 1152 (2d Cir.), prob. juris. noted, --- U.S. ----, 106 S.Ct. 3270, 91 L.Ed.2d 561 (1986), and there is no showing that Judge Lasker abused his discretion in granting it. The threat of irreparable harm to the City is clear. The City has demonstrated a likelihood of success or at least serious questions going to the merits with a balance of hardships in its favor. The preliminary injunction simply preserves a status quo that existed for years after the district court's August 1981 order.
 
 
 21
 The order is affirmed.
 
 
 
 [1]
 The HDM is adjoined by and connected to other detention facilities, C 71 and C 95, and is one of a group of detention facilities which include the Bronx, Queens and Brooklyn Houses of Detention for Men and detention facilities for women and adolescents on Rikers Island
 
 
 [2]
 Six months later, in response to the plaintiffs' motion for relief from overcrowded conditions at the Anna M. Kross Correctional Facility, a detention center for women which is also located on Rikers Island, Judge Lasker, acting pursuant to the parties' consent, ordered that a limit be placed on the number of persons detained in other City dormitory facilities
 
 
 [3]
 New York Criminal Procedure Law, Sec. 430.20, provides in pertinent part as follows:
 "Sec. 430.20 Commitment of defendant
 
 
 [1]
 In general. When a sentence of imprisonment is pronounced, or when the sentence consists of a fine and the court has directed that the defendant be imprisoned until it is satisfied, the defendant must forthwith be committed to the custody of the appropriate public servant and detained until the sentence is complied with."
 
 
 [4]
 In 1977 the average daily number of state-ready prisoners detained at HDM was 189. Thereafter it steadily increased as follows:
 1978 -- 226
 1979 -- 287
 Aug. 1980 -- 650
 By November 19, 1980, when Judge Lasker ruled on the City's first motion to join the State officials as third-party defendants, the State, faced with the prospect of a court order, had reduced the number of state-ready prisoners in City jails to 32, of whom 13 were detained in HDM. However, upon Judge Lasker's ruling that an order joining the State as a party was at that time unnecessary because of the State's voluntary action in reducing the number of state-ready prisoners at HDM, the State allowed the number to increase sharply, with the result that by July 1981 the population of state-ready prisoners in the City's facilities grew to 620.
 Following Judge Lasker's August 1981 order joining the State third-party defendants and ordering them to accept state-ready prisoners within 48 hours after their transfer papers had been processed, the number of such prisoners in City facilities again declined, reaching an average figure of 57 by May 13, 1985, when the State's motion to vacate Judge Lasker's order was filed. However, with the State's reliance on Pennhurst II to relieve it of the August 20, 1981, order and the district court's decision to vacate that order the average daily number of state-readies housed in City facilities increased as follows:
 June 1985 -- 284
 Aug. 1985 -- 423
 Jan. 1986 -- 500 (approx.)
 Mar. 3, 1986 -- 600 (approx.)
 
 
 [5]
 Aside from existing lawsuits claiming overcrowded conditions in the State prison system, Mitchell v. Cuomo, 748 F.2d 804 (2d Cir.1984); Alston v. Coughlin, 109 F.R.D. 609 (S.D.N.Y.1985); New York State Inspection, Security and Law Enforcement Employees, District Council 82 v. Coughlin, Sup.Ct., Albany Cty., Index No. 7781/82, the State is alleged to have contributed to overcrowding and unconstitutional conditions (inadequate medical care, food, exercise, law libraries, etc.) in a number of other local county facilities in Nassau, Onondaga and Suffolk Counties, which are the subject of separate lawsuits. See Badgley I and II, infra (Nassau County); Albro v. County of Onondaga, N.D.N.Y., 627 F.Supp. 1280; Phillips v. Finnerty, E.D.N.Y., Civ. 82-3385 (Suffolk County)
 
 
 [6]
 The absence of any finding of unconstitutionality in Badgley I was emphasized by Judge Newman,
 "In agreeing to specific terms for the operation of the NCCC, the County defendants did not concede that any conditions at the jail falling short of the agreed terms were constitutional violations. The judgment 'resolved' the constitutional issues only in the sense that most consent judgments resolve disputes: It obviated any need to determine whether the claims of constitutional violation were established by substituting for an adjudication of those claims a contractual agreement between the signatories enforceable as a judgment of the District Court upon the Court's approval of the agreement and entry of a judgment. See United States v. Armour & Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). All of the findings made by the Special Master concern the numerous respects in which the conditions at the NCCC were not in compliance with the terms of the consent judgment. To the extent that the District Judge affirmed these findings as constitutional violations, he was in error because no issue of constitutional violation was before him to determine. Whether or not the conditions at the NCCC violate the Constitution, they were found by the Master to violate the consent judgment, and that finding was the only one before the District Court for approval." 729 F.2d at 899.
 
 
 [7]
 F.R.Civ.P. 19(a) provides in pertinent part:
 "Rule 19. Joinder of Persons Needed for Just Adjudication
 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, .... If he has not been so joined, the court shall order that he be made a party."