30 F.3d 367
 The ASSOCIATION FOR RETARDED CITIZENS OF CONNECTICUT, INC.,
William Brilla, by his parents and next friends, Mr. and
Mrs. Anthony Brilla, Ann Marie Olenick, by her mother and
next friend, Mrs. Robert Olenick, Marie Jennie Fortin, by
her father and next friend, George Fortin, Cheryl Eaton, by
her mother and next friend, Ruth Eaton, Allan Riccardi, by
his mother and next friend, Helen Riccardi, David Meli, by
his mother and next friend, Alicia Meli, Joseph Rittlinger,
by his parents and next friends, Mr. and Mrs. Adam
Rittlinger, Gary Rotonto, Stephen Ogren, Tina Sandahl, by
her parents and next friends, Mr. and Mrs. Eric Sandahl,
Philip Teitelman, by his parents and next friends, Mr. and
Mrs. Samuel Teitelman, Kristina Arnold, by her parents and
next friends, Mr. and Mrs. Theodore Arnold, Lisa French, by
her mother and next friend, Carolyn Bullard, Stephen Benson,
by his father and next friend, Robert Benson, Mansfield
Parents Association, Plaintiffs-Appellees,
v.
Gareth THORNE, Commissioner Department of Mental
Retardation, Commissioner, Connecticut Department
of Social Services, Commissioner,
Connecticut Department of
Children & Families,
Defendants,
Commissioner, Connecticut Department of Public Health &
Addiction Services, Defendant-Appellant,
New England Health Care Union, District 1199, Intervenor,
United States of America, Litigating Amicus Curiae.
 No. 1663, Docket 93-9049.
 United States Court of Appeals,
Second Circuit.
 Argued May 4, 1994.
Decided July 25, 1994.
 
 David C. Shaw, Hartford, CT, for plaintiffs-appellees.
 Henry A. Salton, Ass't Atty. Gen., Hartford, CT (Richard Blumenthal, Atty. Gen. for the State of Conn., Richard J. Lynch, Ass't Atty. Gen., of counsel), for defendant-appellant.
 Before: LUMBARD, ALTIMARI, and WALKER, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 The Commissioner of the Connecticut Department of Public Health & Addiction Services, formerly known as the Department of Health Services (hereinafter "DHS"), appeals from a judgment of the United States District Court for the District of Connecticut (Alfred V. Covello, Judge), granting plaintiffs' motion to join DHS as a defendant in this action and issuing a preliminary injunction requiring DHS to abide by the terms of a previously-entered final order, in a proceeding to which DHS was not a party, which restricted when "Do Not Resuscitate" orders may be placed in the medical files of mentally retarded patients. While this case raises the significant issue of when "Do Not Resuscitate" orders should be prescribed for mentally retarded individuals, this appeal primarily concerns the propriety of adding a party to an action pursuant to the All Writs Act, 28 U.S.C. Sec. 1651, after a final order has already been entered on the basis of a consent decree and settlement agreements. We hold that it was improper for the district court to add DHS as a party to this case and accordingly reverse its order granting plaintiffs' joinder motion and issuing a preliminary injunction against DHS.
 
 BACKGROUND
 
 2
 This lawsuit was filed in December 1978 by twelve individual plaintiffs and the Connecticut Association for Retarded Citizens in order to challenge the quality of care, living conditions, and residential placement of some 1200 mentally retarded individuals who either resided at the Mansfield Training School ("MTS") or who had been transferred from MTS to long-term care facilities. The named defendants included the Commissioners of the Department of Mental Retardation ("DMR"), the Department of Social Services, now known as the Department of Income Maintenance ("DIM"), and DHS.
 
 
 3
 In 1980, the district court certified a plaintiff class consisting of "all persons who reside at MTS or who may be transferred there in the future; retarded persons residing at home who are in jeopardy of being sent to MTS; and persons who have been transferred to skilled nursing facilities, intermediate care facilities, homes for the aged, and similar facilities yet remain Mansfield's responsibility." In 1982, the district court granted DHS's motion to be dismissed from the suit on the ground that it was not "essential to the Court's resolving the disputed issues in this litigation." Plaintiffs have never challenged this order.
 
 
 4
 On April 9, 1984, the magistrate judge to whom the case had been referred by the district court approved a consent decree entered into by the remaining parties which provided for an interdisciplinary planning process through which the needs of each class member would be identified and addressed. The magistrate's order provided that he would oversee the implementation of the consent decree and would retain jurisdiction over any necessary future proceedings. In the years that followed, the parties continued to develop policies addressing the needs of class members; some of their settlement agreements were explicitly approved by the magistrate judge.
 
 
 5
 On November 14, 1990, the magistrate judge, with the agreement of the parties, issued a "Final Order" establishing a framework for the ultimate resolution of the case. The Final Order reiterates portions of the consent decree, but also includes new provisions relating to the numerous settlements entered into between 1984 and 1990. One of the new provisions, paragraph XI.J, pertains to the use of "Do Not Resuscitate" ("DNR") orders for class members. It provides in relevant part that:
 
 
 6
 The DMR defendants shall continue to enforce and seek full implementation of the DMR Medical Advisory 87-2 (regarding withholding of cardiopulmonary resuscitation for terminally ill DMR clients) with respect to all classmembers.
 
 
 7
 The referenced Medical Advisory (the "Advisory") is a set of guidelines adopted by DMR in 1987. It provides that the use of DNR orders for a "client of [DMR] who lives in a facility operated or licensed by [DMR]" is appropriate only where the client's attending physician has determined that the client is terminally ill, has requested a second opinion regarding the client's terminal illness from a Connecticut licensed physician in the appropriate specialty, and has presented the client's full medical condition to the client and his or her surrogate for their final approval regarding the use of DNR orders. The Advisory defines a terminally ill patient as one who has an incurable or irreversible medical condition and is considered by the physician to be within "days or weeks" of death. If a client's attending physician cannot state that the client may be expected to die within "days or weeks," the Advisory provides that the Commissioner of DMR, after consulting with the Connecticut Attorney General's Office and DMR's director of community services, will decide whether a particular DNR order is acceptable or further investigation is warranted.
 
 
 8
 On July 9, 1992, about two years after the Final Order had been entered, plaintiffs filed a motion to join DHS as a defendant and for a preliminary injunction requiring DHS along with DMR and DIM to implement the Advisory in all licensed health care facilities in the state. Plaintiffs asserted that many class members were transferred to health care facilities licensed by DHS, such as hospitals and nursing homes, which did not abide by the Advisory, and further, that DMR was unable to implement the Advisory in these facilities without DHS's cooperation. On February 12, 1993, the magistrate judge granted plaintiffs' motion regarding DMR and DIM and recommended granting plaintiffs' motions regarding DHS. The magistrate judge concluded that DHS should be joined as a party pursuant to the All Writs Act because it was "in a position to render the Final Order meaningless," and that, by not implementing the Advisory in its licensed facilities, DHS had violated the Final Order and the class members' constitutional due process rights. The district court adopted and affirmed the magistrate judge's recommended ruling without significant change. DHS subsequently filed this appeal.
 
 DISCUSSION
 
 9
 The primary issue on this appeal concerns the validity of the district court's decision to join DHS to this litigation pursuant to the All Writs Act nearly two years after the Final Order was entered. We review this decision for an abuse of discretion. See In re "Agent Orange" Prod. Liab. Litig., 996 F.2d 1425, 1431 (2d Cir.1993), cert. denied, --- U.S. ----, ----, 114 S.Ct. 1125, 1126, 127 L.Ed.2d 434 (1994).
 
 
 10
 The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. Sec. 1651(a). The Supreme Court has consistently construed this Act to "authorize a federal court 'to issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.' " Pennsylvania Bureau of Correction v. U.S. Marshals Serv., 474 U.S. 34, 40, 106 S.Ct. 355, 360, 88 L.Ed.2d 189 (1985) (quoting United States v. New York Tel. Co., 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977)). "The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." New York Tel. Co., 434 U.S. at 174, 98 S.Ct. at 373 (citations omitted).
 
 
 11
 In this case, the district court added DHS as a defendant after finding that DHS was "in a position to completely frustrate the implementation of the Final Order." The court reasoned that DMR claimed that it was powerless to enforce the Advisory in facilities licensed by DHS and that DHS took the position that it did not have to comply with the Advisory because it was not a party to the litigation. Instead of abiding by the Advisory's procedures of writing DNR orders for class members only when an individual is within days or weeks of death and a second doctor has confirmed the terminal nature of the patient's illness, DHS follows the less restrictive policy of allowing DNR orders when requested by the patient upon entering a facility or when an attending physician determines that it is in the patient's best interests and has received consent from either the patient or the patient's surrogate decisionmaker. Given the impasse between two agencies of the same state, the district court ruled that "joinder of DHS is essential to ensure that the protections set forth in the Final Order for mentally retarded individuals who are in the care of the state are not forfeited in those cases when one state agency, DMR, chooses to place a class-member in a facility licensed by another state agency, DHS." The district court then proceeded to determine that DHS had violated the Final Order and was required to abide by it in the future.
 
 
 12
 We think these rulings constituted an abuse of the district court's discretion for the principal reason that the Final Order was entered based upon the consent of the parties and did not involve an adjudication on the merits. Where the district court exercises its jurisdiction to rule on the merits of a litigation, it determines that the law requires a certain outcome and is empowered to issue remedial orders to effectuate that outcome. By power of the All Writs Act, it may require the compliance of nonparties in order to ensure that its legally-mandated directives are not frustrated. In contrast, where a district court enters a privately-negotiated consent decree, it does not determine that the obligations assumed by the parties are required by law. Indeed, consent decrees often impose rights and obligations greater than those required by law. See Kindred v. Duckworth, 9 F.3d 638, 641 (7th Cir.1993). Because the terms of the consent decree were voluntarily assumed rather than legally imposed, there is no basis for extending the negotiated outcome to a nonparty. While a district court has authority to enforce a judicially-approved consent decree against the parties to it, a district court that enforces the decree against a nonparty acts beyond its jurisdiction and thus beyond the scope of the All Writs Act.
 
 
 13
 In this case, the Final Order evolved from a series of agreements among the parties regarding what kind of treatment the class members would receive in order to resolve their grievances; it did not establish that class members had a constitutional right to the services that DMR and DIM stipulated they would provide. The district court was therefore without authority to extend the agreement to DHS, a party that did not bargain for it or agree to it, simply on the ground that DHS's compliance would help the parties implement their settlement. "The All Writs Act is not a grant of plenary power to the federal courts.... It does not authorize a court to order a party to bear risks not otherwise demanded by law...." Plum Creek Lumber Co. v. Hutton, 608 F.2d 1283, 1289-90 (9th Cir.1979).
 
 
 14
 We find it significant that the district court's decision adding DHS never discussed whether the joinder was necessary or appropriate under Rules 19 or 20 of the Federal Rules of Civil Procedure even though plaintiffs specifically moved under these Rules. We have serious doubts that Rules 19 and 20 would have permitted DHS's joinder even had the Final Order resulted from an adjudication on the merits, and are troubled that the district court circumvented an analysis of them by relying on its perceived powers under the All Writs Act. "Although [the All Writs Act] empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." Pennsylvania Bureau of Correction, 474 U.S. at 43, 106 S.Ct. at 361.
 
 
 15
 In Badgley v. Varelas, 729 F.2d 894 (2d Cir.1984), we recognized the inherent problem of enforcing a consent decree against a nonparty. In that case, we overturned a district court order requiring state officials to take action to implement a consent judgment entered into between plaintiff inmates and county officials to alleviate overcrowding in a county prison. We held that relief should not have been ordered against the state officials because, inter alia, they had neither agreed to any provisions respecting the inmates at the county jail nor received a ruling that they had violated the inmates' constitutional rights. We observed that "[t]he judgment 'resolved' the constitutional issues only in the sense that most consent judgments resolve disputes: It obviated any need to determine whether the claims of constitutional violation were established by substituting for an adjudication of those claims a contractual agreement between the signatories enforceable as a judgment of the District Court upon the Court's approval of the agreement and entry of a judgment." Id. at 899. We concluded that "[i]f the plaintiffs have constitutional claims against the State defendants, they remain free to pursue such claims," but that ordering relief against them on the present record was inappropriate and premature. Id. at 901.
 
 
 16
 In this case, as in Badgley, the district court improperly ordered relief against a defendant based on a consent judgment to which it was not a party. The only difference between Badgley and this case is that once the district court joined DHS to this litigation, it proceeded to rule that DHS had violated class members' due process rights. However, plaintiffs' reliance on this determination for the purpose of keeping DHS in the case is misplaced. Because the district court improperly joined DHS in the first place, it lacked jurisdiction to determine whether DHS committed any constitutional violations and its constitutional ruling must therefore be vacated. DHS is entitled to defend the propriety of its actions in an independent suit where it is not prejudiced by the presence of extraneous claims or parties and an unrelated litigation history.
 
 
 17
 The problem with plaintiffs' position in this case becomes apparent when we compare Badgley with Benjamin v. Malcolm, 803 F.2d 46 (2d Cir.1986), cert. denied, 480 U.S. 910, 107 S.Ct. 1358, 94 L.Ed.2d 528 (1987). In Benjamin, the district court added state officials as third-party defendants in a prison crowding case and ordered them to accept custody of "state-ready" prisoners housed in city correctional facilities. The final judgment in Benjamin was based on a stipulation between prisoners and city officials that admitted that the conditions at the city prison were unconstitutional; in addition, the district court explicitly ruled that "the presence of the State officials as parties in the case was essential to assure protection of the plaintiffs' adjudicated constitutional rights." Id. at 50. We thus held in Benjamin that Badgley was "clearly distinguishable from the present suit where there has been an adjudication of unconstitutionality and the State officials have been joined as third-party defendants allegedly contributing to and implementing that violation of the Constitution." Id. at 52. The critical distinction to be drawn from a comparison of these cases, then, is whether the original judgment involves an adjudication of constitutionality. Where it does, the district court can utilize its power under the All Writs Act to require nonparties not to frustrate its remedial orders. But, where the judgment is based solely on a consent decree, it generally cannot be enforced against third parties.
 
 
 18
 Our numerous decisions in the United States v. IBT litigation are fully consistent with our current holding. In that litigation, we had several opportunities to explore the reach of the All Writs Act as to nonparties in an ongoing litigation concerning the implementation of a consent decree between the government and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT") aimed at ridding the union of organized crime influence. See, e.g., United States v. IBT, 968 F.2d 1506 (2d Cir.1992) ("Independent Committees"); United States v. IBT, 968 F.2d 1472 (2d Cir.1992) ("Commercial Carriers"); United States v. IBT, 964 F.2d 180 (2d Cir.1992) ("Pension Fund Trustee"); United States v. IBT, 948 F.2d 98 (2d Cir.) ("Yellow Freight"), vacated with directions to dismiss as moot, --- U.S. ----, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992); United States v. IBT, 931 F.2d 177 (2d Cir.1991) ("Electoral Rules Decision"); United States v. IBT, 907 F.2d 277 (2d Cir.1990). In the earliest of these cases, we affirmed a district court order issued pursuant to the All Writs Act restraining all members and affiliates of the IBT from instituting suit challenging the consent decree in any jurisdiction except the Southern District of New York. 907 F.2d at 279. We observed that the injunction was necessary to prevent duplicative and inconsistent litigation and "to protect the district court's jurisdiction over the parties to the Consent Decree quite apart from any binding effect that the Decree may have on affiliates." Id. at 280.
 
 
 19
 In the Electoral Rules Decision, we recognized the general rule that consent judgments should not be enforced against nonparties. We stated:
 
 
 20
 It is true that, for purposes of interpretation, a consent decree is treated as a contract among the settling parties, Firefighters v. City of Cleveland, 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), and that the terms of a consent decree cannot be enforced against those who are not parties to the settlement. Martin v. Wilks, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989).
 
 
 21
 931 F.2d at 185. However, based on an exception to the rule where the interests of nonparties have been adequately represented by parties to the consent decree, we upheld a district court order binding various IBT-affiliated joint councils and locals to the consent decree insofar as the election of IBT officers was concerned since these affiliates derived their authority from the hierarchical IBT association and were adequately represented by the IBT when the consent decree was negotiated. Id. at 185-86. Cf. United States v. IBT ("Friedman & Hughes"), 905 F.2d 610, 622 (2d Cir.1990) (union member could be bound by terms of consent decree agreed to by the IBT which delegated certain powers under the IBT Constitution to court-appointed officers). The exception we relied upon is not applicable in this case because none of the parties to the Consent Decree ever purported to represent DHS or its interests. Quite to the contrary, DHS had been dismissed from the litigation by order of the court.
 
 
 22
 Although Yellow Freight was vacated by the Supreme Court due to mootness, and is therefore deprived of precedential effect, see O'Connor v. Donaldson, 422 U.S. 563, 577 n. 12, 95 S.Ct. 2486, 2494-95 n. 12, 45 L.Ed.2d 396 (1975); Andrulonis v. United States, 26 F.3d 1224, 1231-32 (2d Cir.1994), it merits discussion because it involved a scenario closer to the present case but found it unnecessary to resolve the question we have answered today. In that decision, we reviewed a district court order directing a nonparty employer to permit union employees to campaign for office on its premises. The employer appealed based on the distinction we rely on above, namely "that a consent decree, as distinguished from a judgment resulting from litigation pursued to completion, cannot be enforced against a nonparty." 948 F.2d at 103. Our opinion did not reach the merits of this argument because of the limited nature of the court's order:
 
 
 23
 Whatever the force of this argument, it is unavailing in this case because the district court has not purported to deem Yellow Freight bound by the Consent Decree. Instead, it has ruled that an order may issue under the All Writs Act to effectuate the Decree.
 
 
 24
 Id. Here, in contrast, the district court deemed DHS bound by the Final Order and, further, held DHS to be in violation of the Order's terms and ordered its future compliance with the provisions of the Advisory.
 
 
 25
 Our other IBT decisions are equally consonant with our current decision. If anything, they show a decided tendency to restrain the district court's exercise of its powers under the All Writs Act. See, e.g., Independent Committees, 968 F.2d at 1512 (reversing district court ruling extending consent decree to independent entities, noting that extension reflected a desire to implement "personal notions of union democracy and fair play" not warranted by any applicable law); Commercial Carriers, 968 F.2d at 1477 (invalidating application of consent decree to nonparty because it was not "agreeable to the usages and principles of law"); Pension Fund Trustee, 964 F.2d at 185 (vacating district court order imposing retrospective money obligation on trustee of pension fund). Our review of these cases reinforces our conclusion that the district court's order in this case was not a proper exercise of its jurisdiction.
 
 CONCLUSION
 
 26
 Although not presented for our direct review, we are sensitive to the complex host of issues raised in this case. On the one hand, plaintiffs and DMR stress the need to protect mentally retarded persons from adverse medical decisions being made on their behalf, and potentially being made because of their retardation. On the other hand, DHS maintains that compliance with the Advisory is not mandated by the Constitution and would actually violate patients' rights to refuse medical treatment. Our decision expresses no opinion on these matters. We conclude only that the district court's decision to add DHS to this suit after a final consent judgment had already been entered was not authorized by the All Writs Act. Our decision does nothing to foreclose future litigation of the important issues at stake in this case.
 
 
 27
 For the foregoing reasons, we reverse the district court's decision adopting the recommended ruling of the magistrate judge.